(c) The Company shall have the right to cure any Redemption Default if within thirty (30) days (five (5) days if the default is due to the nonpayment of monies) following notice of default from Palisades of such default, if the Company cures such default within such thirty (30) day (five (5) days with respect to the payment of monies) period. If the Company cures such default within the requisite time period, the applicable Redemption Default shall be cured as if same had not occurred. Furthermore, where a distribution is not timely remitted which results in a Redemption Default and such distribution is thereafter paid by the Company along with any related costs and expenses incurred by Palisades as a result of such Redemption Default prior to Palisades exercising its rights under Section 2.09, such payment shall result in the Redemption Default being cured.

**5.05 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

**6.01 Reserved.**

**6.02 Reserved.**

**6.03 Restrictions on Transfer.** No Member may transfer its Ownership Interest or any part thereof without the unanimous approval of the Voting Members; provided, however, in the event of a Redemption Default, Palisades may freely transfer all direct or indirect interests which it may have in the Company without the approval of any other Member, and upon any such transfer by Palisades of all or any portion of its Ownership Interest following a Redemption Default, such transferee shall be automatically admitted to the Company as a new Member with all of the rights to which Palisades is entitled under this Agreement.

**6.04 Involuntary Transfer of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest (including by death, divorce or disability), shall constitute a material breach of this Agreement by such Member. The creditor, transferee or other claimant, shall only have the rights of an Assignee, and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances, and shall be entitled only to receive the share of profits and losses, and the return of capital, to which the Member would otherwise have been entitled. The Voting Members, including a Voting Member whose interest is the subject of the charging order, lien, bankruptcy, or involuntary transfer, may unanimously elect, by written notice that is provided to the creditor, transferee or other claimant, at any time, to purchase all or any part of Membership Interest that was the subject of the creditor's charging order, lien, bankruptcy, or other involuntary transfer, at a price that is equal to one-half (1/2) of the book value of such interest, adjusted for profits and losses to the date of purchase. The Members agree that such valuation is a good-faith attempt at fixing the value of the interest, after taking into account that the interest does not include all of the rights of a Member or Manager, and after deducting damages that are due to the material breach of this Agreement.

## ARTICLE VII
## ACCOUNTING, RECORDS AND REPORTING

**7.01 Books and Records.** The Company shall keep books and records in accordance with accepted accounting principles. The books and records shall be open for inspection and copying by any Member without cost to such Member. The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

**7.02 Inspection of Books and Records.** Each Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in Section 7.1; and (b) obtain from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

**7.03 Accountings.** As soon as is reasonably practicable after the close of each Fiscal Year, the Voting Members shall make or cause to be made a full and accurate accounting of the affairs of the Company as of the close of that Fiscal Year and shall prepare or cause to be prepared a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Members' equity showing the respective Capital Accounts of the Members as of the close of such Fiscal Year and the distributions, if any, to Members during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Company, all of which the Manager shall furnish to each Member. In addition, the Company shall furnish to each Member, information regarding the Company necessary for such Member to complete such Member's federal and state income tax returns. The Company shall also furnish a copy of the Company's tax returns to any Member requesting the same. On such accounting being made, profits and losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Company to the respective Members as herein provided. Until such time as Palisades has been Redeemed in Full, it shall have the right to approve all tax returns filed by the Company including all elections included therein. Until such time as Palisades has been Redeemed in Full, the Company shall provide monthly financial reports to the Members, within ten (10) days following the end of each calendar month with respect to such preceding calendar month, which financial reports shall include all expenses and income of the Company for the calendar month and balance sheet as of the last day of the calendar month detailing all assets and liabilities of the Company and the Capital Accounts of each Member.

**7.04 Filings.** The Voting Members, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Voting Members, at Company expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative bodies amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Company is required by the Act to execute or file any document and fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Delaware Secretary of State.

**7.05 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other person.

**7.06 Company Representative.** Barton shall be the partnership representative of the Company pursuant to Section 6223(a) of the Code (the "Company Representative"). Notwithstanding that Barton is the Company Representative with respect to such tax years, all nonministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to unanimous approval of the Voting Members. For example, but not by way of limitation, the Company Representative shall not take any position or action with the Internal Revenue Service (the "Service") without prior unanimous approval of the Voting Members, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; or (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code. If an audit results in an imputed underpayment as determined under Section 6225 of the Code, the Company and/or Barton shall accept sole responsibility for payment of any such underpayment and indemnify and hold harmless Palisades from any such underpayment. The Company Representative shall furnish to each Member a copy of all notices or other written communications received by the Company Representative from the Service within five (5) days of receipt thereof. The Company Representative shall notify each Member of all communications it has had with the Service and shall keep all Members informed of all matters which may come to its attention in its capacity as Company Representative by giving them written notice thereof within five (5) days after the Company Representative becomes informed of any such matter or within such shorter period as may be required by the appropriate statutory or regulatory provisions. Nothing contained herein is intended to authorize the Company Representative to take any action which is left to the determination of an individual Member under Sections 6221 through 6241 of the Code (and/or comparable provisions of state and local law). All non-ministerial decisions regarding tax elections, audit, tax litigation, settlement and other tax matters shall be subject to the written consent of each Member of the Company during the tax year at issue that subsequently Transferred its interest in the Company (each, a "Former Member"). For example, but not by way of limitation, the Company Representative shall not take any position or action with the Service without prior written consent of each Former Member, including but not limited to any decision (i) to enter into a settlement agreement with respect to any Company tax matter; (ii) to file a petition as contemplated in Section 6234(a) of the Code; (iii) to file any request contemplated in Section 6227 of the Code; (iv) to enter into an agreement extending the period of limitations as contemplated in Section 6235(b) of the Code; or (v) to make the "push out" election under Section 6226(a) of the Code. A Former Member shall not be required to pay any expenses incurred by the Company in connection with any tax matters. The Company hereby agrees to indemnify, defend and hold each Former Member harmless of and from any and all liabilities, claims, demands, and expenses of any kind or nature which arise or in any way relate to any violation or breach of this Section 5.4. This Section 5.4 will survive a Member's ceasing to be a member of the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

**7.07 Financial Information, Reports and Notices.**

(a) DREI will cause to be prepared and delivered to each of the Members:

(i) monthly, not later than ten (10) days following the end of each calendar month, management reports for the Project including progress reports on development activity regarding the Project and a report detailing expenditures pursuant to the Project Budget including any variations from same ;

(ii) monthly, not later than ten (10) days following the end of each calendar month, financial statements of the Company, including (A) a balance sheet as of the end of such month and an income statement for such month prepared in accordance with the standard accounting principles of DREI and the amount of unreturned Capital Contributions of each Member, and (B) a cash flow statement for such month; and

(iii) annually, not later than thirty (30) days after the close of each calendar year, financial statements of the Company, including (A) a balance sheet as of the end of such calendar year, and an income statement for such calendar year, prepared in accordance with the standard accounting principles of DREI, (B) a cash flow statement for such calendar year, (C) the amount of unreturned Capital Contributions of each Member as of the last day of such calendar year, and (D) a summary report describing in reasonable detail the financial and business activities of the Company during such calendar year.

(b) The DREI will promptly deliver to Palisades copies of any notices of default under (i) any loan including, without limitation, under the Loan Documents, and (ii) under any of the Development Agreements.

**7.08 Tax Returns**. DREI shall cause to be prepared and filed all necessary federal and state income or franchise tax returns for the Company. Each Member shall furnish to DREI all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. For federal income tax purposes, Palisades shall not be a Member of the Company (i.e. a partner in the Company filing a partnership tax return); rather the Capital Contributions of Palisades shall be treated as debt of the Company for federal income tax purposes and Palisades shall be treated as a lender to the Company for federal income tax purposes. For state law purposes, however, Palisades shall be a Member of the Company having the rights set forth in this Agreement and granted to a Member under the Act and the federal income tax treatment of Palisades shall have no effect on Palisades' status as a Member of the Company..

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

**8.01 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Voting Members.

**8.02 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Voting Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4. The Voting Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

8.03 **Distributions in Kind.** Any noncash assets distributed to the Members shall first be valued at their fair market value to determine the profit or loss that would have resulted if such assets were sold for such value. Such profit or loss shall then be allocated pursuant to this Agreement, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged against the Capital Account of each Member receiving an interest in a distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by unanimous consent of the Voting Members, or if any Voting Member objects, by an independent appraiser (and any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by unanimous consent of the Voting Members.

8.04 **Order of Payment of Liabilities on Dissolution.** After a determination that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as provided in Section 5.02 hereof.

8.05 **Adequacy of Payment.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, shall have been adequately provided for if payment thereof shall have been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section. This Section shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

8.06 **Compliance with Regulations.** All payments to the Members on the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d), as the voting Members deem appropriate.

8.07 **Limitations on Payments Made in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution or share of profits (on dissolution or otherwise) against any other Member. No Member shall have any obligation or liability to restore or contribute capital to the Company on account of a deficit capital account which may exist at any time for such Member.

8.08 **Certificate of Cancellation.** The Voting Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Delaware Secretary of State, a certificate of cancellation of the Certificate on the completion of the winding up of the affairs of the Company.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

9.01 **Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company,

except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member. Notwithstanding any contrary provision of this Agreement, each of the Company and DREI waive to the maximum extent possible under the Act all fiduciary duties which Palisades might otherwise owe to the Company or any other Member or Manager under the Act.

**9.02 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party. Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters may be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (i) written affirmation by the person requesting indemnification of its good-faith belief that it has met the standard of conduct necessary for indemnification by the Company and (ii) a written undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.

**9.03 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Member or an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as a Member or an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under Section 10.1 or under applicable law.

## ARTICLE X
## MISCELLANEOUS

**10.01 Authority.** This Agreement constitutes a legal, valid and binding agreement of each Member, enforceable against such Member in accordance with its terms. Each Member is empowered and duly authorized to enter into this Agreement (including the power of attorney herein) under every applicable governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like. The person, if any, signing this Agreement on behalf of the Member is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholder resolution or the like.

**10.02 Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys' fees and expenses) suffered or incurred on account of or arising out of any breach of this Agreement by that Member.

**10.03 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth beneath such Member's name on the signature pages of this Agreement. A Member may change the Member's address for purposes of this Agreement by providing notice to the Company and each Member of such change of address.

**10.04 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**10.05 Binding Effect.** Subject to Article VI, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**10.06 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.07 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings and agreements between or among the parties, regarding the subject matter hereof.

**10.08 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

**10.09 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**10.10 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**10.11 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members to the agreement at the time of the amendment.

**10.12 Attorneys' Fees.** In any dispute between or among the Company and one or more of the Members, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses including, without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Attorneys' fees shall include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

**10.13 Remedies Cumulative.** Remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**10.14 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in Dallas County, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

**10.15 Palisades Approvals.** If Palisades fails to respond to any notice requesting its approval or consent under this Agreement within five (5) Business Days of receipt of such notice requesting its approval or consent, Palisades shall be deemed to have approved the matter for which approval or consent was requested. Notwithstanding the preceding, if within five (5) Business Days of receipt of any approval or consent request notice, Palisades denies such approval or consent or requests further information in order to make its decision, Palisades' approval or consent shall not be deemed granted. Palisades agrees to undertake any response to any approval or consent request in good faith and shall act in its reasonable discretion unless its sole discretion is expressly provided for any such approval or consent request.

**10.16 Palisades Payments.** All distributions or payments of any kind due to Palisades under this Agreement shall be wired in same day available funds to such account as Palisades may provide notice.

[Signatures on following page.]

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

**MEMBERS**

DALLAS REAL ESTATE INVESTORS, LLC
a Delaware limited liability company

By: ______________________________
Name: Timothy Barton
Its: President

1755 Wittington, Suite 340
Dallas, Texas 75234

PALISADES TC LLC,
a Texas limited liability company

By: ______________________________
Joaquin Charles de Monet, Manager

1919 McKinney Ave., Suite 100
Dallas, Texas 75201

## Exhibit A

## PROJECT BUDGET AND SUMMARY

**Project Name:** Frisco Project

**Project Summary:** Acquisition of 4.5385 acres, located at the northwest corner of future John Hickman Parkway and the Dallas North Tollway upon which will be developed (i) 231 hotel rooms, (iii) 15,000 square feet of meeting space, (iv) certain retail space, (v) certain restaurant space all of which as more fully described and conceptually shown in the PD zoning ordinance approved by the City on August 18, 2015, as Ordinance No. 15-08-57, as may be amended (the "Project").

**As defined in the "Purchaser's Statement" for the closing of the Frisco Property which may be revised as necessary upon consent of the President as evidenced by the President's execution of such statement.**

**12-Month Pre-development Budget**

| **Month** | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Month** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Architectural & Engineering | 100,000 | 100,000 | 100,000 | 100,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 450,000 | 450,000 | 2,800,000 |
| Market Studies | | | | 25,000 | | | 50,000 | | | | | | 75,000 |
| Appraisal | | | | 25,000 | | | | | | | | | 25,000 |
| Civil/Survey | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Organization Costs | 10,000 | | | | 25,000 | | | | | | | | 35,000 |
| Geotech | | | | | 25,000 | | | | | | | | 25,000 |
| Project Management | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| Legal | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 |
| Insurance | 20,000 | | | | | | | | | | | | 20,000 |
| **Total** | 177,500 | 147,500 | 147,500 | 197,500 | 347,500 | 297,500 | 347,500 | 297,500 | 297,500 | 297,500 | 497,500 | 497,500 | 3,550,000 |

EXHIBIT B
Members of DALLAS REAL ESTATE LENDERS, LLC

| Member's Name and Address | Capital Contribution | Percentage Ownership Interest | Class | Percentage Voting Interest |
|---|---|---|---|---|
| Palisades TC LLC<br>1919 McKinney Ave.,<br>Suite 100<br>Dallas, TX 75201 | $3,500,000.00 | 50% | A | 50% |
| Dallas Real Estate Investors, LLC<br>1755 Wittington<br>Suite 340<br>Dallas, TX 75234 | $10.00 | 50% | A | 50% |

# Exhibit B

2 CIT ESERVE / JURY DEMAND
FILED
4/22/2020 4:05 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

**Cause No. DC-20-05960**

| | | |
|---|---|---|
| **PALISADES TC, LLC, INDIVIDUALLY, AND ON BEHALF OF FIVE STAR GM, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFF,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **FIVE STAR MM, LLC AND TIMOTHY BARTON, INDIVIDUALLY,** | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Plaintiff Palisades TC, LLC ("Plaintiff" or "Palisades") individually, and on behalf of Five Star GM, LLC ("Five Star GM"), files this Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Five Star MM, LLC (the "Company") and Timothy Barton ("Barton"), individually, (collectively, "Defendants"), and alleges as follows:

## I. DISCOVERY CONTROL PLAN AND STATEMENT OF RELIEF

1. Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because it seeks injunctive relief.

2. Pursuant to Texas Rule of Civil Procedure 47, Plaintiff seeks monetary relief over $1,000,000. The damages sought are within the jurisdictional limits of the court.

## II. PARTIES

3. Plaintiff Palisades TC, LLC is a Texas limited liability company doing business in Dallas County at 1919 McKinney Ave., Suite 100, Dallas, Texas 75201.

4. Defendant Five Star MM, LLC is a Delaware limited liability company, and may be served by and through its registered agent ONE Agent Texas, LLC, at 13901 Midway Rd, Suite 102, Dallas, TX 75244-75244.

5. Defendant Timothy Barton is an individual that may be served with process at his residence in Dallas County at 3525 Arrowhead Drive, Dallas, Texas 75204, or wherever he may be found.

## III. JURISDICTION AND VENUE

6. All the parties hereto are subject to the Court's jurisdiction. The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

7. Venue is proper in Dallas County under Section 15.002(a) of the Texas Civil Practice and Remedies Code because all of the events and omissions giving rise to the claims asserted herein occurred in Dallas County, Texas. Further, venue is proper pursuant to the provisions contained in the contracts at issue. *See* Ex. A at § 10.14, Ex. B at § 18.08.

## IV. FACTS

8. Barton is the Chief Executive Officer of JMJ Development ("JMJ"), a real estate developer in Dallas, Texas.

### A. Relevant Company Agreements

9. On September 16, 2019, Plaintiff and Barton entered into the Amended and Restated Company Agreement of Five Star MM, LLC (the "Company Agreement") to form the Company. Plaintiff and Barton are the only two Members of the Company. A true and accurate copy of the Company Agreement is attached hereto as Exhibit A and incorporated herein by reference.

10. The Company was formed for the sole purpose of managing all entities having a

direct or indirect beneficial ownership interest in MO 2999TC, LLC, a Delaware limited liability company established for the sole purposes of acquiring and developing certain real property and the improvements thereon located at 2999 Turtle Creek Boulevard, Dallas, Texas (the "Turtle Creek Project").

11. Barton is the Member, President, and Manager of the Company. *See* Ex. A at §§ 2.01, 4.01, and 2.08.

12. On September 16, 2019, Plaintiff also entered into and became a Member of the Company Agreement of Five Star GM, LLC (the "Five Star GM Agreement", together with the Company Agreement, the "Company Agreements") to form Five Star GM. The Company is the Managing Member of Five Star GM. The only other Member of Five Star GM is 2999 TC JMJ MGR, LLC. A true and accurate copy of the Five Star GM Agreement is attached hereto as Exhibit B and incorporated herein by reference. All capitalized terms used herein that are not specifically defined herein shall have the meanings provided in the Company Agreements.

13. The sole business and purpose of Five Star GM is its ownership interests and related rights in Five Star TC, LLC as the sole member of MO 2999TC MZ, LLC as the sole member of MO 2999TC LLC ("Turtle Creek Project Owner") which acquired the real property where the Turtle Creek Project is located and to take such action necessary to construct and develop a mixed use project including a luxury hotel and residences on the real property (*i.e.*, the Turtle Creek Project).

**B. Defendants' Obligations under the Company Agreements**

14. First, upon formation of Five Star GM, Plaintiff contributed $4,000,000 to Five Star GM as a Preferred Capital Contribution (the "Priority Capital"). Plaintiff's contribution earned it a Base Return or Default Return, as applicable. Thus, the Five Star GM Agreement requires that distributions are made to Plaintiff as follows:

a. First, the Base Return or, if applicable, the Default Return, *see* Ex. B at § 5.02(a)(i);

b. Next, on or before March 9, 2020, an amount equal to no less than fifty percent (50%) of Plaintiff's Unreturned Priority Capital, *see* Ex. B at § 5.02(a)(ii); and

c. Next, on or before March 9, 2020, an amount equal to no less than 50% of the amount distributed to Plaintiff pursuant to item b above, *see* Ex. B at § 5.02(a)(iii).

15. Second, the Company Agreements require that Defendants provide to Plaintiff timely financial information reports. *See* Ex. A at § 7.03, Ex. B at § 12.03.

16. Third, the Company Agreements require that Defendants obtain prior written approval of certain actions, *see* Ex. A at § 2.08, Ex. B at § 6.02, including, but not limited to the following actions:

a. Entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, *see* Ex. A at § 2.08(e), Ex. B at § 6.02(e);

b. Entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), *see* Ex. A at § 2.08(f), Ex. B at § 6.02(f);

c. Entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company or Five Star GM or any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, *see* Ex. A at § 2.08 (g), Ex. B at § 6.02(g); and

d. Entering into, modifying, amending or terminating any agreement with Mandarin Hotels, *see* Ex. A at § 2.08(ff), Ex. B at § 6.02(ff).

17. Fourth, the Company Agreements provide that the Company and Five Star GM shall keep books and records that shall be open for inspection and copying by any Member. *See* Ex. A at § 7.01, Ex. B at § 12.01.

**C. Redemption Default**

18. Under the Five Star GM Agreement, a Redemption Default shall occur upon the

happening of any of the following relevant events:

a. Five Star GM fails at any time to distribute all amounts due to Plaintiff pursuant to Section 5.02(a)(i), *see* Ex. B at § 5.04(a)(i);

b. Five Star GM fails to distribute all amounts due to Plaintiff pursuant to Sections 5.02(a)(i) and (ii) on or before March 9, 2020, *see* Ex. B at § 5.04(a)(ii); and

c. The Company, any Member other than Plaintiff, or Five Star GM breaches any of its obligations under the Five Star GM Agreement, including, without limitation, the failure to obtain the approval of Plaintiff whenever required in the Five Star GM Agreement, *see* Ex. B at § 5.04(a)(iv).

**D. Plaintiff's Remedies under the Company Agreements**

19. Under the Five Star GM Agreement, Plaintiff has the following remedies in the event of a Redemption Default:

a. Plaintiff shall have the right to require the Company, to request an additional Capital Contribution from the Members other than Plaintiff in an amount sufficient to bring Plaintiff current on the distributions (the "Capital Call Right"), *see* Ex. B at § 5.04(b); and

b. Plaintiff shall have the right to act on behalf of Five Star GM and cause Five Star GM to act on behalf of each Operating Company, in each instance in its sole and absolute discretion without the consent or approval of the Company or any other Member of Five Star GM or any Operating Company, to market and cause the sale of the Turtle Creek Project to an independent third party on such terms and conditions as Plaintiff may determine appropriate in its sole and absolute discretion. Further, the Company and each Member of Five Star GM shall cooperate and shall cause Five Star GM and each Operating Company to cooperate with Plaintiff to accomplish such sale (the "Sale Right"). *See* Ex. A at § 2.09, Ex. B at § 5.05.

**E. Defendants' Redemption Defaults under the Company Agreements**

20. As a result of the formula laid out in § 5.02 of the Five Star GM Agreement, Five Star GM was required to distribute $3,000,000, to Plaintiff on or before March 9, 2020 (the "March Unreturned Priority Capital Payment"). However, Defendants failed to cause Five Star GM to make the March Unreturned Priority Capital Payment to Plaintiff, which is a Redemption Default

under Section 5.04(a)(ii) of the Five Star GM Agreement (the "March Payment Redemption Default"). Further, Defendants have failed to cause Five Star GM to cure this Redemption Default in the time period prescribed by the Five Star GM Agreement following notice of default from Plaintiff.

21. After the March Payment Redemption Default and after Defendants failed to give any clear indication to Plaintiff of when it intended to cause Five Star GM to make the March Unreturned Priority Capital Payment, on March 20, 2020, Plaintiff sent Defendants a letter ("Notice of Default") officially notifying them of their existing and potential defaults under the Company Agreements, which included, but were not limited to, the March Payment Redemption Default, failure by Defendants to submit *any* financial reports as required by the Company Agreements, and failure to obtain prior written approval from Plaintiff for actions taken by the Company on behalf of Five Star GM. A true and accurate copy of the Notice of Default is attached hereto as Exhibit C and incorporated herein by reference.

22. On March 27, 2020, in response to Plaintiff's Notice of Default, Defendants sent Plaintiff a Project Status and Force Majeure Forbearance Request ("Forbearance Request"). The Forbearance Request failed to demonstrate that Defendants had any realistic plan to promptly cure the various existing defaults under the Company Agreements. Instead, the Forbearance Request simply confirmed the fact that, in many respects, Defendants had engaged in a course of improper conduct that breached their fiduciary duties to Five Star GM and its Members, including Plaintiff, breached their fiduciary duties to the Company's Members, including Plaintiff, and have materially breached the Company Agreements. A true and accurate copy of the Forbearance Request is attached hereto as Exhibit D and incorporated herein by reference.

23. The Forbearance Request also confirmed to Plaintiff that Defendants: (i) had

executed multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff, in breach of the Company Agreements and (ii) indebted the Company and Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company and Five Star GM of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff, in breach of the Company Agreements.

24. The foregoing breaches of Defendants' obligations are each a Redemption Default under Section 5.04(a)(iv) of the Five Star GM LLC Agreement.

25. Further, Plaintiff's Unreturned Priority Capital normally earns a Base Return due on the first day of each month, which is equal to nine percent (9%) per annum, accrued on the Unreturned Priority Capital. However, a Default Return equal to fourteen percent (14%) per annum on Plaintiff's Unreturned Priority Capital shall apply immediately at such times as any Base Return is not distributed on the due date thereof and the Default Return shall accrue in lieu of such Base Return not timely distributed.

26. Defendants also failed to cause Five Star GM to timely distribute the Base Return to Plaintiff that was due on or before April 1, 2020, which is another Redemption Default under Section 5.04(i) of the Five Star GM Agreement (the "April Payment Redemption Default"). As a result of the April Payment Redemption Default, the Default Return applies to the payment which was due on April 1, 2020 and which currently remains outstanding (the "April Default Return Payment").

27. Further, at the permission of Defendants, JMJ, Barton's affiliated entity, is occupying space in the Turtle Creek Project without the written approval of Plaintiff. Defendants'

actions are in direct violation of the Company Agreements. *See* Ex. A at § 2.08(f), Ex. B at § 6.02(f). Further, such action constitutes a self-dealing transaction in breach of Defendants fiduciary duty of loyalty under the Company Agreements.

**F. Final Demand for Defendants to Comply with Their Obligations under the Company Agreements**

28. On April 8, 2020, Plaintiff's counsel responded on behalf of Plaintiff to the Forbearance Request and the April Payment Redemption Default by sending a final demand requesting the following from Defendants (the "Final Demand"):

a. The March Unreturned Priority Capital Payment;

b. The April Default Return Payment;

c. All agreements that have been entered into related to the Turtle Creek Project, including but not limited to, any agreements with Mandarin Hotel Group, SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates (the "Turtle Creek Project Agreements");

d. The monthly financial reports from September 2019 through March 2020 that are required under Section 7.03 of the Company Agreement;

e. The required financial information, reports, and notices from September 2019 through March 2020 as required by Section 12.03(a)(i)-(iii) of the Five Star GM Agreement;

f. All agreements, including but not limited to, any lease agreements or license agreements, with JMJ or any other affiliate of Barton to occupy space at the Turtle Creek Project; and

g. Access to and the right to inspect and copy the following books and records of the Company and Five Star GM pursuant to Section 7.02 of the Company Agreement, Section 12.02 of the Five Star GM Agreement, and Section 18-305 of the Delaware Limited Liability Company Act:

i. Balance sheets by month from September 1, 2019 through the present day;

ii. Profit and loss statements by month from September 1, 2019 through the present day;

iii. Cash flow statements by month from September 1, 2019 through the

present day; and

iv. Five Star GM information and documents regarding the Turtle Creek Project, including but not limited to (1) any agreements with any contractor, supplier, vendor or other third party related to the Turtle Creek Project along with contact information for all such parties, (2) any correspondence with lenders, including but not limited to any default notices, and (3) any notices, citations or other correspondence from any State or local governmental entity related to the Turtle Creek Project.

29. A true and accurate copy of the Final Demand is attached hereto as Exhibit E and incorporated herein by reference.

30. In the Final Demand, Plaintiff also exercised its Capital Call Right and expressly reserved its right to exercise its Sale Right.

31. In response to the Final Demand, Defendants disputed that any Redemption Default had occurred (the "Final Demand Response") and merely provided final, executed copies of seven of the many agreements that Defendants had entered into without written approval from Plaintiff, as required by the Company Agreements (the "Final Demand Production"). A true and accurate copy of the Final Demand Response and the Final Demand Production is attached hereto as Exhibit F and Exhibit G, respectively, and incorporated herein by reference. However, Defendants failed to provide *any* of the financial and accounting records to which Plaintiff is entitled and failed to provide any assurances that it had made a meaningful effort to try and obtain the requested information, in clear breach of the Company Agreements.

**G. Plaintiff's Exercise of its Sale Right**

32. The most pressing concern for Plaintiff is its intention to move forward with exercising its Sale Right under the Company Agreements. In order to exercise that remedy, Plaintiff must have the most current understanding and status of its substantial financial investment in Five Star GM and an accurate understanding of the business transactions of the entity. The

requested information is essential to Plaintiff's exercise of its Sale Right. The information requested from Defendants is what is required, at a minimum to for Plaintiff to conduct its due diligence related to the exercise of its Sale Right. Additionally, and as previously noted, Plaintiff is also contractually allowed access to such information.

33. Further, Defendants are obligated to cooperate and shall cause Five Star GM to cooperate with Plaintiff to accomplish a sale of the Turtle Creek Project.

34. Accordingly, Defendants should be enjoined from preventing Plaintiff's access to the books and records of the Company and Five Star GM, and enjoined from undertaking any action with respect to or on behalf of Five Star MM or Five Star GM or with respect to or on behalf of Five Star TC, LLC, MO 2999TC MZ, LLC, MO 2999TC, LLC, and 2999 TC Acquisitions without the prior written approval of Palisades TC, LLC.

35. The current state of the national economy, and specifically, the current dynamics in the commercial real estate market due to the COVID-19 pandemic create an imminent threat of irreparable harm to Plaintiff. The current real estate market is unpredictable and Plaintiff needs to act fast if it has any hopes for selling the Turtle Creek Project at its highest value which is ont of Plaintiff's primary remedies for the Redemption Defaults that have occurred under the applicable company agreements. Further, the Turtle Creek Project, which is a real estate development project stands to be irreparably damaged if it continues to be managed and operated by Defendants.

## V. CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT (COMPANY AGREEMENT)

36. The allegations above are incorporated herein by reference as if set forth in this Count.

37. The Company Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Company Agreement provided that Defendants would provide to

Plaintiff timely financial information reports and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to the Company and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels.

38. Plaintiff fully performed its contractual obligations under the Company Agreement.

39. Defendants breached the Company Agreement by (i) failing to submit *any* financial reports; (ii) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (iii) indebting the Company by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (iv) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; and (v) failing to provide access to the books and records of the Company.

40. Defendants breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 2 – BREACH OF CONTRACT (FIVE STAR GM AGREEMENT)**

41. The allegations above are incorporated herein by reference as if set forth in this

Count.

42. The Five Star GM Agreement is a valid and enforceable written contract between Plaintiff and Defendants. The Five Star GM Agreement provided that Defendants would pay Plaintiff the Unreturned Priority Capital Payment on March 9, 2020, pay Plaintiff the Base Return (or Default Return) on April 1, 2020, provide to Plaintiff timely financial information reports, and would obtain prior written approval from Plaintiff of certain actions, including, but not limited to, (a) entering into, amending, modifying, terminating or canceling any property management agreement with any Person for management and leasing of the Turtle Creek Project, (b) entering into, amending, modifying, terminating or canceling any Related-Party Agreement (defined as any agreement with any Affiliate of Barton), (c) entering into, amending, modifying, terminating or canceling any contract, lease, loan agreement, letter of credit, mortgage, note, guaranty of indebtedness or other instrument evidencing indebtedness that requires future payments by or to Five Star GM and any Operating Company of more than $100,000 in any year except as provided in the Turtle Creek Project Budget, and (d) entering into, modifying, amending or terminating any agreement with Mandarin Hotels. The Five Star GM Agreement further provides that Defendants would cooperate with Plaintiff in the event that it exercised its Sale Right.

43. Plaintiff fully performed its contractual obligations under the Five Star GM Agreement by providing the Preferred Capital Contribution of $4,000,000.

44. Defendants breached the Five Star GM Agreement by (i) failing to make the March Unreturned Priority Capital Payment; (ii) failing to make the April Default Return Payment; (iii) failing to submit any financial reports; (iv) executing multiple management agreements with Mandarin Hotel Group without the prior written approval of Plaintiff; (v) indebting Five Star GM by contracting with SLS Consultants, FAB Studio, Studio Munge, Alvine Engineering, Brockette

Davis Drake, Talley & Associates, and Lerch Bates, which, upon information and belief, require future payments by or to the Company of more than $100,000 in any year not provided in the Turtle Creek Project Budget without the prior written approval of Plaintiff; (vi) permitting JMJ to occupy space in the Turtle Creek Project without the written approval of Plaintiff; (vii) failing to provide access to the books and records of Five Star GM; and (viii) failing to cooperate with Plaintiff in exercising its Sale Right.

45. Defendants' breach caused injury to Plaintiff, which resulted in actual damages and the inability to proceed with effecting the sale of the Turtle Creek Project.

**COUNT 3 – BREACH OF FIDUCIARY DUTY**

46. The allegations above are incorporated herein by reference as if set forth in this Count.

47. Defendants, as the Managers of the Company and Five Star GM, owed fiduciary duties to Plaintiff.

48. Defendants breached their fiduciary duty of loyalty to Plaintiff and Five Star GM by engaging in self-dealing when they permitted JMJ to occupy space at the Turtle Creek Project without first obtaining written approval from Plaintiff.

49. Defendants' breach of their fiduciary duty of loyalty has injured Plaintiff and Five Star GM.

50. Defendants' breach of their fiduciary duty of loyalty to Plaintiff and Five Star GM benefited Defendants by providing free office space for an affiliate of Barton at the detriment to Plaintiff and Five Star GM.

51. Accordingly, Plaintiff seeks damages within the jurisdictional limits of this Court.

**COUNT 4 – FRAUD**

52. The allegations above are incorporated herein by reference as if set forth in this